1

2

3                                          E-FILED on 11/29/11

4

5

6

7

8

9                    IN THE UNITED STATES DISTRICT COURT

10           FOR THE NORTHERN DISTRICT OF CALIFORNIA

11

TRISTAN V. HARVEY,                    )     No. C 08-2947 RMW (PR)
12                                     )
                Petitioner,            )     ORDER DENYING PETITION
13                                     )     FOR WRIT OF HABEAS
                                       )     CORPUS; GRANTING IN PART
14      vs.                            )     AND DENYING IN PART
                                       )     CERTIFICATE OF
15                                     )     APPEALABILITY
M. C. KRAMER, Warden,                  )
16                                     )
                Respondent.            )
17   _____)

18

19

20          Petitioner, a state prisoner proceeding pro se, seeks a writ of habeas corpus pursuant to

21   28 U.S.C. § 2254.  Respondent was ordered to show cause why the writ should not be granted.

22   Respondent has filed an answer, along with a supporting memorandum of points and authorities

23   and exhibits.  Petitioner has responded with a traverse.  For the reasons set forth below, the

24   petition is **DENIED**.

25   ///

26   ///

27   ///

28   ///

1

**BACKGROUND**

2        The following summary of the facts of petitioner's commitment offense is taken from the

3    April 30, 2007 state appellate court opinion affirming the judgment of the trial court.

4

5        On November 6, 2003, John Doe patronized Matteucci's bar in
         San Anselmo.  He was new in town.  He met Zephyr Carter when

6        he went outside to smoke.  Back in the bar, Doe offered to buy
         Carter a drink.  Receiving an affirmative response, Doe bought

7        Carter a shot of Jameson whiskey.  Carter introduced Doe to Jason
         Voelker.  Voelker asked if anyone needed "weed."  Doe said he'd
         take "a twamp."  Voelker said he needed a ride and Doe offered

8        him the keys to his rental car.  Voelker declined.

9

10       Later, when Doe was trying to get a seat at the bar, he spotted
         Voelker, went up to him, tapped him on the shoulder and said,
         "Hey, nigga, let me get in here."[1]  Voelker did not think the

11       comment was "cool" and looked at [petitioner], his friend, who
         told Doe, "That's not cool, you shouldn't say that."  Doe

12       apologized.  [Petitioner], an African-American male, was wearing
         a green military hat with a Bob Marley patch on the back.  He had

13       curly black hair, a goatee, and wore a black coat.

14

15       Approximately a half hour later Voelker asked Doe if he could
         borrow money for a drink.  Doe gave him $5.  Voelker also asked

16       Doe for a ride home.  They left around 1:30 a.m. for Voelker's
         apartment in San Rafael.  Doe pulled into the underground garage.
         Voelker invited Doe to his apartment; they stepped into the

17       elevator.  The elevator stopped before Voelker's floor and
         [petitioner] rushed in, spoke to Voelker, then jumped out.  Doe

18       realized he was "screwed," "set up."  Doe followed Voelker into
         the apartment and went to the balcony to jump off, but it was "too

19       tall."  Doe went back inside but left the balcony door open.

20

21       Voelker was there.  [Petitioner] and another man[2] rushed in and
         attacked Doe.  [Petitioner] was still wearing the hat with the Bob

22       Marley patch.  [Petitioner] struck the first blow, punching Doe in
         the face with a closed fist, jolting his head.  The third man knocked

23       Doe down.  Doe "was getting punched and kicked"; he yelled and
         said "I'm sorry."[3]  Voelker put a bear hold on Doe, choking him

24    _____

25       [1]    Voelker is a White male.

26       [2]    Doe described the third assailant as "a mulatto looking kid" who

27              he "noticed at the end of the night at the bar" with [petitioner].

28       [3]    Doe explained that he was yelling "I'm sorry" because "when I
                saw [petitioner], I noticed, like, that was the [petitioner] from the

Order Denying Petition for Writ of Habeas Corpus
C:\Documents and Settings\USDC\Local Settings\Temp\notesBCBF1C\Harvey947deny.hc.wpd

2

while telling Doe to be quiet.  [Petitioner] held Doe's arm, stole his watch and ripped off a chain.  The other assailant took his shoes and belt, looped the belt and whipped Doe in the chest, legs and feet.  He also demanded Doe's ATM cash card, but he did not have it with him.

[Petitioner] said "Get the knife."  Doe slipped out of the hold.  The third assailant stomped on his head and they ordered him to kneel.  The third assailant struck Doe in the head with a Duraflame log.  Doe slipped out of his shirt, ran to the third-story balcony and jumped.  He cracked his chin open but remained conscious.  Doe ran down a hill to the street.  Dennis Boese spotted Doe, without a shirt or shoes, bleeding profusely and waving him over.  Boese drove Doe home.  The assailants had stolen Doe's keys and identification.  He told his girlfriend, Melinda Swanson, to pack and they left within five minutes.  They drove to a friend's home in San Francisco.  Doe was bleeding "a lot."  Doe's friends convinced him to go to the hospital.  Hospital personnel contacted the police.  Emergency room staff stapled Doe's head and stitched his chin.  Doe also had a broken nose and thumb, scrapes, bruises and belt marks.

After leaving the hospital Doe and Swanson drove by Voelker's apartment and then went to the police department.  Doe accompanied the police to Voelker's apartment complex.  The police recovered an olive green military cap on the apartment grounds.  Doe's rental car was in the garage.  Doe mentioned a Ford Explorer which was also in the garage.  It was registered to Voelker.  The police found other indicia of ownership in Voelker's name in a dumpster.  Doe suddenly became agitated and pointed out Voelker walking across the parking lot.  The police apprehended Voelker.

The police also executed a search warrant on Voelker's apartment.  They found Doe's chain, and identified bloodstains on the kitchen floor and a baseboard.

On November 21, 2003, Doe and Carter identified [petitioner] out of a photographic lineup.  At the same time Doe misidentified another man (Kelly, a White male) as the third (African-American) assailant.

A prosecution investigator interviewed Sarah Shelly on January 13, 2004.  Shelly indicated that she remembered being at

bar and-and what took place [saying the word 'n-i-g-g-a' to Voelker] and just thought . . . that's what's going on, that's the reasoning for the beat down."

1
2
> Matteucci's bar on the night in question.  She knew [petitioner], and recalled that he was there.

3
People v. Harvey, No. A109795, 2007 WL 1242098 (Cal. Ct. App. 1 Dist. Apr. 30, 2007).

4
5
6
7
8
9
10
11
12
13
    Following a jury trial, petitioner was convicted of (1) first degree robbery (Cal. Penal Code §§ 211, 213(a)(1)); (2) assault by means likely to cause great bodily injury (Cal. Penal Code § 245); and (3) false imprisonment by violence (Cal. Penal Code § 236).  (CT at 207-08.)  As to all counts, petitioner was found guilty of personally inflicting great bodily injury pursuant to Cal. Penal Code § 12022.7(a).  (Id.)  On March 23, 2005, petitioner was sentenced to the middle term of six years on the robbery count.  (Resp. Ex. A at 209-11, 213-14; Ex. B at 900-04.)  A three-year sentence on the assault count and a two-year sentence on the false imprisonment count were stayed, pursuant to Cal. Penal Code § 654.[4]  (Id.)  A consecutive three-year term was imposed for the great bodily injury enhancement, for a total sentence of nine years.  (Id.)  Petitioner was given 105 days credit for time served.  (RT 902.)

14
15
16
17
18
19
20
21
22
23
    In 2007, on direct appeal, the state appellate court affirmed the judgment.  (Resp. Ex. C.)  The state supreme court denied the petition for review.  (Resp. Ex. G.)  Petitioner filed state habeas petitions in the Marin County Superior Court, the California Court of Appeal, and the California Supreme Court.  (Amended Pet. Exs. C-E.)  All were summarily denied.  (Id.)  Petitioner filed a petition in this court alleging exhaustion of one constitutional claim on June 12, 2008.  (Dkt. #1.)  On that same date, petitioner filed a "motion for stay/abeyance and leave to amend petition for writ of habeas corpus," asking this court to stay the petition while he exhausted additional claims in state court.  (Dkt. #2.)  On September 11, 2008, the court granted petitioner's motion to stay the petition.  (Dkt. #6.)

24
25
26
27
28
    [4] Cal. Penal Code § 654 provides in relevant part:

> An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision.

On September 26, 2008, petitioner filed an amended petition and notified the court that the California Supreme Court had denied his state habeas petition on September 17, 2008, thereby exhausting his claims.  (Dkt. #7.)   Accordingly, on October 27, 2008, the court re-opened the action.  (Dkt. #10.)

## DISCUSSION

A.   **Standard of Review**

Because the instant petition was filed after April 24, 1996, it is governed by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), which imposes significant restrictions on the scope of federal habeas corpus proceedings.  Under the AEDPA, a federal court may not grant habeas relief with respect to a state court proceeding unless the state court's ruling was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts."  Williams (Terry) v. Taylor, 529 U.S. 362, 412-13 (2000).  "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  Id.  "[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 411.

"[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable."  Id. at 409.  In examining whether the state court decision was objectively

1  unreasonable, the inquiry may require analysis of the state court's method as well as its result.

2  Nunes v. Mueller, 350 F.3d 1045, 1054 (9th Cir. 2003).  The "objectively unreasonable"

3  standard does not equate to "clear error" because "[t]hese two standards . . . are not the same.

4  The gloss of clear error fails to give proper deference to state courts by conflating error (even

5  clear error) with unreasonableness."  Lockyer v. Andrade, 538 U.S. 63, 75 (2003).

6       The state court decision to which 28 U.S.C. § 2254 applies is the "last reasoned decision"

7  of the state court.  See Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v. Fleming,

8  423 F.3d 1085, 1091-92 (9th Cir. 2005).  The last reasoned decision constitutes an "adjudication

9  on the merits" for purposes of 28 U.S.C. § 2254(d) if the court resolved the rights of the parties

10  based on the substance of the claim, rather than on the basis of a procedural or other rule that

11  precluded the state court from reviewing the merits.  Barker, 423 F.3d at 1092.

12       The standard of review under AEDPA is somewhat different where the state court gives

13  no reasoned explanation of its decision on a petitioner's federal claim and there is no reasoned

14  lower court decision on the claim.  In such a case, a review of the record is the only means of

15  deciding whether the state court's decision was objectively reasonable.  See Plascencia v.

16  Alameida, 467 F.3d 1190, 1197-98 (9th Cir. 2006).  When confronted with such a decision, a

17  federal court should conduct "an independent review of the record" to determine whether the

18  state court's decision was an objectively unreasonable application of clearly established federal

19  law.  Plascencia, 467 F.3d at 1198.

20       **B.     Petitioner's Claims**

21

22       As grounds for federal habeas relief petitioner claims:  (1) the trial court's exclusion of

23  the victim's previous misidentification was objectively unreasonable because the exclusion

24  denied petitioner his federal constitutional right to confront the only percipient witness against

25  him and to present his defense of mistaken identity; (2) the trial court committed prejudicial

26  error by instructing the jury with a legally incorrect alternative aiding and abetting theory that

27  omitted the personal infliction element of Cal. Penal Code § 12022.7; (3) petitioner's conviction

28  for first degree robbery in a dwelling house was not supported by substantial evidence because it

omitted the material element of habitation; and (4) it was reversible error to instruct the jury pursuant to CALJIC No. 17.20 because it allowed the jury to find petitioner guilty without meeting the statutorily required elements of Cal. Penal Code § 12022.7.

       1.    <u>Exclusion of Previous Misidentification</u>

Petitioner claims that the trial court erroneously excluded evidence of the victim's previous misidentification of one of the assailants. In the way of background, as discussed above, there were three assailants. <u>People v. Harvey</u>, 2007 WL 1242098 at *1. One assailant, Voelker, was a white male. <u>Id.</u> at *1, n.1. Petitioner, the second assailant, is an African-American male. <u>Id.</u> at *1. The third assailant was also African-American, and the victim described him as "a mulatto looking kid." <u>Id.</u> at *1-2 & n.2. The victim identified Voelker to the police on November 7, 2003, the day after the assault, by pointing out Voelker walking across the parking lot of Voelker's apartment complex. <u>Id.</u> at *2. On November 21, 2003, the victim and Carter, another individual at Matteucci's bar on the night of the attack, identified petitioner from a photographic lineup. <u>Id.</u> at *2. The victim was definite and unhesitating in his identification of petitioner. (RT 51, 237-38, 240, 362, 502, 534, 601.)

Regarding the third assailant, the victim misidentified a Mr. Kelly (a white male) from a photographic lineup as the third (African-American) assailant. <u>People v. Harvey</u>, 2007 WL 1242098 at *2. The victim's misidentification of Kelly resulted in Kelly's arrest and presence at a preliminary hearing to determine whether he should stand trial with petitioner and Voelker. (RT 506-07.)[5]

Petitioner sought to cross-examine the victim on the misidentification of Kelly as well as another earlier misidentification of a Mr. Reyes, summarized by the Court of Appeal as follows:

> [Petitioner] proffered evidence that a week prior to identifying Kelly and himself as the African-American assailants, Doe identified a Hispanic male (Reyes) as one of the African-American assailants. Specifically, [petitioner] offered to prove that in November 2003 Doe called 911 to report he was following one of

---

[5] Kelly was not held to answer, and the third perpetrator was never identified or charged. (<u>See</u> RT 24-25.)

the suspects. The police caught up, stopped the driver, and detained him.  The police compiled a photo spread including Reyes.

People v. Harvey,  2007 WL 1242098 at *6.  As soon as the victim viewed Reyes' photograph, he informed the police that Reyes was not a suspect and that the attacker he thought was Reyes was African-American, not Hispanic.  (RT 49-50, 57.)

The trial judge, who had also presided over the earlier trial against Voelker, arising from the same assault, permitted testimony about the misidentification of Kelly but not the misidentification of Reyes.  People v. Harvey,  2007 WL 1242098 at *6.  The trial court reasoned that this was consistent with the evidence allowed at Voelker's trial and that at Voelker's trial:

he did not allow testimony about Reyes "on the theory that Mr. Reyes was being followed by Mr. Doe.  By the time Mr. Doe had a chance to look carefully at the photo lineup, he readily said, 'No, no, no, this isn't the right fellow,' and that was the end of that.  I felt that that was really pretty remote, and I still do."

People v. Harvey,  2007 WL 1242098 at *6.  Therefore, consistent with the Voelker trial, the trial court allowed the defense to introduce evidence of the misidentification of Kelly, but not of Reyes.  Id.

Petitioner argues that the trial court's exclusion of the victim's misidentification of Reyes denied petitioner his federal constitutional right to confront the victim and present his mistaken identity defense.

The Confrontation Clause of the Sixth Amendment provides that, in criminal cases, the accused has the right to "be confronted with the witnesses against him."  U.S. Const. amend. VI. The ultimate goal of the Confrontation Clause is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee.  Crawford v. Washington, 541 U.S. 36, 61 (2004).  It commands not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination.  Id.; see Davis v. Alaska, 415 U.S. 308, 315-16 (1974) (noting "a primary interest" secured by the Confrontation Clause "is the right of

cross-examination").  The right to cross-examine under the Confrontation Clause provides the

opportunity to "expose to the jury the facts from which jurors . . . could appropriately draw

inferences relating to the reliability of the witness." Davis, 415 U.S. at 318.

The Confrontation Clause does not prevent a trial judge from imposing reasonable limits

on cross-examination based on concerns of harassment, prejudice, confusion of issues, witness

safety or interrogation that is repetitive or only marginally relevant.  Delaware v. Van Arsdall,

475 U.S. 673, 679 (1986).  The Confrontation Clause guarantees an opportunity for effective

cross-examination, not cross-examination that is effective in whatever way, and to whatever

extent, the defense might wish.  See Delaware v. Fensterer, 474 U.S. 15, 20 (1985) (per curiam).

To determine whether a criminal defendant's Sixth Amendment right of confrontation has been

violated by the exclusion of evidence on cross-examination, a court must inquire whether: (1) the

excluded evidence was relevant; (2) there were other legitimate interests outweighing the

defendant's interest in presenting the evidence; and (3) the exclusion of evidence left the jury

with sufficient information to assess the credibility of the witness.  United States v. James, 139

F.3d 709, 713 (9th Cir. 1998).

With respect to the first factor, relevance, the victim's misidentification of Reyes was

minimally, if at all, relevant to whether the victim accurately identified petitioner.  As noted

above, the evidence entailed nothing more than the victim misidentifying Reyes from a moving

car.  As soon as the victim saw Reyes' photograph, he informed the police that Reyes was not

one of the assailants.  Such evidence had low probative value.  Indeed, given that the victim did

not identify Reyes as a suspect, it is questionable whether the evidence can be characterized as a

"misidentification" at all.

The second factor, legitimate interests outweighing the defendant's interests in presenting

the evidence, also weighs against petitioner.  Here, the trial court concluded that the evidence

lacked probative value and would only confuse or distract the jury.  (RT 51-52.)  This court finds

that avoidance of jury confusion was legitimate given the nature of the evidence.  Specifically, it

was never clear which of the African-American assailants the victim was attempting to identify

Order Denying Petition for Writ of Habeas Corpus
C:\Documents and Settings\USDC\Local Settings\Temp\notesBCBF1C\Harvey947deny.hc.wpd

9

1    when he followed Reyes by car.  (See RT 46-58.)  Consequently, the jury might be confused as

2    to how the evidence applied to petitioner.  Further, given that the victim did not ultimately

3    "misidentify" Reyes, the evidence bore little relation to petitioner's mistaken identity defense,

4    rendering the evidence a distracting side-story at trial.  Finally, this court finds that petitioner's

5    interest in introducing the evidence was minimal given the weak probative value of the evidence,

6    as discussed above in connection with the first factor, and given petitioner's ability to introduce

7    other stronger misidentification evidence in support of his defense of mistaken identity, as

8    discussed below in connection with the third factor.  Indeed, the fact that the victim was so

9    unequivocal and immediate in eliminating Reyes as a suspect upon photographic inspection, yet

10   later so definite in identifying petitioner, could have served to bolster the victim's credibility,

11   such that the evidence would work against petitioner's interest.  In sum, the trial court's interest

12   in avoiding jury confusion and distraction outweighed petitioner's interest in presenting the

13   Reyes misidentification.

14        Finally, the third factor, whether the jury was left with sufficient information to assess the

15   victim's credibility, weighs against admissibility.  As noted above, the trial court permitted

16   evidence of the victim's misidentification of Kelly.  (RT 58.)  Thus, the jury did hear evidence

17   that the victim misidentified a possible assailant, giving the defense an opportunity to attack the

18   victim's identification skills.  At several points during trial, the jury heard evidence that the

19   victim misidentified Kelly, including the fact that the misidentification resulted in Kelly's arrest

20   and presence at the preliminary hearing.  (RT 244-47, 363, 502, 506-07, 591-92.)  Any

21   additional evidence relating to the earlier "misidentification" of Reyes would have been

22   cumulative at best.  See Evans v. Lewis, 855 F.2d 631, 633-34 (9th Cir. 1988) (finding no

23   violation of Confrontation Clause where trial court restricted cross-examination of prosecution

24   witness whose bias and motivation had been clearly established and evidence sought to be

25   introduced only cumulative on issue of credibility).  In sum, the jury had sufficient information

26   with which to assess the credibility of the victim, specifically whether he had accurately

27   identified his attackers.

28        Petitioner is not entitled to federal habeas relief on this claim.

Order Denying Petition for Writ of Habeas Corpus
C:\Documents and Settings\USDC\Local Settings\Temp\notesBCBF1C\Harvey947deny.hc.wpd                10

///

///

2.      Aiding and Abetting Instruction

Petitioner claims that the trial court erred by instructing the jury with an aiding and abetting theory that omitted the personal infliction element of Penal Code section 12022.7.  In the way of background, as discussed above, petitioner was convicted of (1) first degree robbery; (2) assault by means likely to cause great bodily injury; and (3) false imprisonment by violence. (CT at 207-08.)  As to all counts, petitioner was found guilty of personally inflicting great bodily injury pursuant to Cal. Penal Code§ 12022.7(a).  This section requires that a person "personally" inflict great bodily injury.  Petitioner contends the trial court, in contradiction to the requirements of this enhancement, instructed the jury that they could find him guilty on a legally incorrect aiding and abetting theory.  Petitioner argues that the instruction gave the jury the option to convict him on the great bodily injury enhancement under a direct-participant theory, which was legally permissible, or on an aiding and abetting theory, which was legally impermissible.[6]

A challenge to a jury instruction solely as an error under state law does not state a claim cognizable in federal habeas corpus proceedings.  See Estelle v. McGuire, 502 U.S. 62, 71-72 (1991).  To obtain federal collateral relief for errors in the jury charge, a petitioner must show that "'the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'"  Id. at 72 (quoting Cupp v. Naughton, 414 U.S. 141, 147 (1973)).  The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record.  Id.

Petitioner does not show how the challenged aiding and abetting instruction "so infected"

---

[6] Under California law, "a mere aider and abetter cannot receive the special great bodily injury enhancement; only a person who directly participates in the physical attack can receive the enhancement."  People v. Banuelos, 106 Cal. App. 4th 1332, 1337 (2003) (citing People v. Cole, 31 Cal. 3d 568, 571 (1982)).

his trial.  A review of the record shows that the jury was instructed regarding the meanings of

principal and aider and abettor as follows:

> Persons who are involved in committing a crime are referred to as
> principals in that crime.  Each principal, regardless of the extent or
> manner of participation, is equally guilty.

> Principals include, (1) Those who directly and actively commit the
> act constituting the crime, or (2) Those who aid and abet the
> commission of the crime.

> A person aids and abets the commission of a crime when he or she:
> (1) With knowledge of the  unlawful purpose of the perpetrator,
> and (2) With the intent or purpose of committing or encouraging or
> facilitating the commission of the crime, and (3) By act or advice
> aids, promotes, encourages, or instigates the commission of the
> crime.

(RT 771, CT 171-72.)  Thereafter, the court instructed on the elements of the three charged

crimes of robbery, assault, and false imprisonment.  (RT 772-79.)

The court then instructed the jury on the great bodily injury enhancement allegation per

CALJIC 17.20:

> It's alleged in counts one, two, and three that in the commission of
> a felony, the defendant personally inflicted great bodily injury on
> John Doe.

> If you find the defendant guilty of any of the felonies charged, you
> must determine whether the defendant personally inflicted great
> bodily injury on John Doe in the commission of each of those
> crimes.

> Great bodily injury, as used in this instruction, means a significant
> or substantial physical injury.  Minor, trivial, or moderate injury
> does not constitute great bodily injury.

> When a person participates in a group beating, and it is not
> possible to determine which assailant inflicted that particular
> injury, he or she may have been found to have personally inflicted
> great bodily injury upon the victim if, (1) the application could
> have caused the great bodily injury suffered by the victim; or (2)
> that at the time the defendant personally applied unlawful physical
> force to the victim, the defendant then knew, or reasonably should
> have known that the cumulative effect of all the unlawful physical
> force would result in great bodily injury to the victim.

(RT 779-80, CT 188 (emphasis added).)

Looking at the record as a whole, the instructions given adequately required the jury to find petitioner "personally inflicted" great bodily injury before it could find petitioner guilty of the section 12022.7(a) enhancement.  Specifically, (1) the aiding and abetting instruction preceded the instructions on the elements of the three charged crimes, (2) the great bodily injury special allegation was contained in a more specific instruction that the jury would consider only after finding petitioner guilty of at least one of the three charged crimes[7], (3) such special allegation instruction set out a condition limiting guilt to circumstances where the defendant "personally inflicted" great bodily injury, and (4) such special allegation instruction included instructions for "group beatings," which were more specific than the aiding and abetting instruction.[8]  Taking these factors together, it is not reasonably likely the jury applied the aiding and abetting instruction to the special allegation.  Accordingly, the state court's denial of this claim was not contrary to, or an unreasonable application of, established federal authority.

Petitioner is not entitled to federal habeas relief on this claim.

3.      Sufficiency of the Evidence

Petitioner claims that his right to due process was violated because there was insufficient evidence to support the jury's finding that he committed the robbery in count 1 "within an

---

[7] See People v. Modiri, 39 Cal. 4th 481, 493 (2006) ("CALJIC No. 17.20 requires jurors to first determine the defendant's guilt of the charged crime.  The instruction applies if they then decide that he participated in a group beating, and that it is not possible to determine which assailant inflicted a particular injury.") (internal quotations, citation, and brackets omitted).

[8] See Sandoval v. Bank of America, 94 Cal. App. 4th 1378, 1388 n.8 ("[W]here two instructions are inconsistent, the more specific charge controls the general charge. . . . Therefore, if the jury regarded the two instructions as inconsistent, it is more likely that they followed the . . . specific instruction.") (internal quotations, citation, and brackets omitted).

inhabited dwelling house," as required by of Cal. Penal Code § 213(a)(1)(A).

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970). A state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt therefore states a constitutional claim, which, if proven, entitles him to federal habeas relief. Jackson v. Virginia, 443 U.S. 307, 321, 324 (1979).

A federal court reviewing collaterally a state court conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt. Payne v. Borg, 982 F.2d 335, 338 (9th Cir. 1992). The federal court "determines only whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" See id. (quoting Jackson, 443 U.S. at 319) (emphasis in original). Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt, may the writ be granted. See Jackson, 443 U.S. at 324. On habeas review, a federal court evaluating the evidence under Winship and Jackson should take into consideration all of the evidence presented at trial. LaMere v. Slaughter, 458 F.3d 878, 882 (9th Cir. 2006).

As there is no reasoned state court opinion on petitioner's "sufficiency of evidence" claim, this court must conduct an independent review of the record to determine whether the state courts' summary decisions rejecting this claim represent an objectively unreasonable application of clearly established federal law. Plascencia, 467 F.3d at 1198.

Cal. Penal Code § 213(a), the robbery statute under which petitioner was convicted and sentenced states in relevant part:

> (1) Robbery of the first degree is punishable as follows:
>
> (A) If the defendant, voluntarily acting in concert with two or more other persons, commits the robbery within an inhabited dwelling

> house, . . . or the inhabited portion of any other building, by
> imprisonment in the state prison for three, six, or nine years.

Cal. Penal Code § 213(a) (emphasis added).

      To be an "inhabited dwelling" under California law, the person with the possessory right to the premises must use them as his or her domiciliary dwelling as opposed to something else, such as a place of business.  People v. Villalobos, 145 Cal. App. 4th 310, 321 (2006).  However, the dwelling

> need not be the victim's regular or primary living quarters in order
> to be deemed an inhabited dwelling house.  Rather, the "inhabited-
> uninhabited dichotomy" turns . . . on the character of the use of the
> building. . . . [T]he proper question is whether the nature of a
> structure's composition is such that a reasonable person would
> expect some protection from unauthorized intrusion.  Thus, a
> temporary place of abode, such as a weekend fishing retreat, a
> hospital room or even a jail cell may qualify.

Id. at 318 (citations and internal quotes omitted).  "A formerly inhabited dwelling becomes uninhabited only when its occupants have moved out permanently and do not intend to return to continue or to resume using the structure as a dwelling."  Id. at 320 (citing People v. Guthrie, 144 Cal. App. 3d 832, 838-40 (1983)).  For example, in People v. Cardona, 142 Cal. App. 3d 481 (1983), the California Court of Appeal held that a defendant could not be convicted of first degree burglary of a dwelling house where renters had moved out of the house and had no intention of spending another night in the house, even though some of their property was still in the house at the time of the burglary.[9]  "A structure that was once used for dwelling purposes is no longer inhabited when its occupants permanently cease using it as living quarters, and no other person is using it as living quarters."  People v. Rodriguez, 122 Cal. App. 4th 121, 132 (2004) (citing Cardona, 142 Cal. App. 3d at 483).

---

[9] The term "inhabited dwelling house" has the same meaning in both the California robbery and California burglary statutes.  People v. Villalobos, 145 Cal. App. 4th 310, 316 (2006).

1     Petitioner argues that the apartment where the commitment offense occurred – Jason

2  Voelker's apartment – was not an "inhabited dwelling" under California law because Voelker

3  was no longer living in the apartment.  In support of this argument, petitioner submits a

4  declaration from Voelker stating that by the end of October 2003, he had moved out of the

5  apartment and had left some furniture and other items there until he could find a place for them.

6  (Amended Pet. Ex. F).[10]   In addition to submitting the Voelker declaration, petitioner asks the

7  court to take judicial notice of police officer testimony describing the condition of the apartment,

8  from the separate trial of Mr. Voelker.  (Amended Pet. at 22-23.)

9     Respondent correctly points out that this evidence was not before the jury at petitioner's

10  trial and cannot be considered by this court in analyzing petitioner's sufficiency of evidence

11  claim.  Herrera v. Collins, 506 U.S. 390, 402 (1993) (holding sufficiency of evidence review, for

12  purposes of habeas relief, is limited to record evidence; it does not extend to nonrecord evidence,

13  including newly discovered evidence).  Accordingly, the Voelker declaration will be stricken,

14  and the request for judicial notice will be denied.

15     Here, a review of the trial record shows: (1) Voelker referred to the apartment as his

16  "house" and "home" (RT 166, 177); (2) Voelker had access to the apartment (id. at 186, 189);

17  (3) Voelker directed the victim on how to get to the apartment and where in the garage to park

18  (id. at 185-86); (4)  furniture and clothes were in the apartment (id. at 231-32, 484, 628, 630,

19  645); (5) police detectives found mail addressed to Voelker in the dumpster of the apartment

20  complex (id. at 482), indicating at least recent use as a mailing address; (6) Voelker used the

21  apartment to meet with friends (id. at 187, 190); and (7) Voelker's car was parked in the

22  apartment garage on the morning following the commitment offense (id. at 480-81, 641-42, 653,

23  662), also suggesting that Voelker was still treating the apartment as his to occupy.  Viewing the

24  evidence in the light most favorable to the prosecution, this was sufficient evidence upon which

25  a rational trier of fact could find beyond a reasonable doubt that Voelker's apartment was an

26

27     [10] Voelker also states in his declaration that he was living in a hotel in Mill Valley at the

28  time of the commitment offense and that when he was arrested at the apartment on November 7,
   2003, he was there to retrieve the remainder of his possessions.  (Amended Pet. Ex. F).

1    "inhabited dwelling."  Petitioner is not entitled to federal habeas relief on this claim.

2    ///

3    ///

4    ///

5            4.     CALJIC No. 17.20

6            Petitioner claims the trial court erred in instructing the jury under CALJIC No. 17.20

7    because it allowed the jury to find petitioner guilty without meeting the statutorily required

8    elements of Cal. Penal Code § 12022.7, in violation of petitioner's federal due process rights.

9            As discussed above, a state court's determination of whether an instruction is allowed

10   under state law cannot form the basis for federal habeas relief.  Estelle, 502 U.S. at 67-68.  To

11   obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing

12   instruction by itself so infected the entire trial that the resulting conviction violates due process.

13   Id. at 72.

14           Petitioner was charged with violating Cal. Penal Code § 12022.7(a), which imposes an

15   additional consecutive three year prison term on a person who "personally inflicts great bodily

16   injury on any person other than an accomplice in the commission of a felony or attempted

17   felony."  Petitioner's jury was instructed on this enhancement allegation with CALJIC No.

18   17.20, as follows:

19
20                      When a person participates in a group beating, and it is not
                        possible to determine which assailant inflicted that particular
21                      injury, he or she may have been found to have personally inflicted
                        great bodily injury upon the victim if, (1) the application could
22                      have caused the great bodily injury suffered by the victim; or (2)
                        that at the time the defendant personally applied unlawful physical
23                      force to the victim, the defendant then knew, or reasonably should
                        have known that the cumulative effect of all the unlawful physical
24                      force would result in great bodily injury to the victim.

     (RT 779-80, CT 188.)

25           Petitioner argues that the first part of CALJIC No. 17.20 improperly allowed the jury to

26   find him guilty of assault on the victim even if he did not personally inflict any injury.  He also

27   challenges the second part of the instruction, to the extent that it allowed the jury to convict him

28   based only on his knowledge of the action of others and not on his own actions.

The California Court of Appeal rejected this argument, reasoning as follows:

> Recently, in *People v. Modiri* (2006) 39 Cal.4th 481, 492, 46 Cal.Rptr.3d 762, 139 P.3d 136 ( *Modiri* ) our Supreme Court decided a challenge to CALJIC No. 17.20 wherein the defendant claimed prejudicial error in violation of federal and state due process rights.  There, among other things, the defendant was convicted of felony assault and to enhance the sentence in any future prosecution, the jury sustained an allegation under section 1192.7, subdivision (c)(8) that in the course of the assault he personally inflicted great bodily injury upon the victim.  ( *Modiri, supra,* at p. 485, 46 Cal.Rptr.3d 762, 139 P.3d 136.)

> Concluding that no instructional error or constitutional violation occurred, the Supreme Court rejected the defendant's assertion that the jury must find that he, himself, produced a particular grievous injury or wielded a particular weapon or blow causing such injury: "The term 'personally,' which modifies 'inflicts' in section 1192.7[, subdivision] (c)(8), does not mean exclusive here.  This language refers to an act performed 'in person,' and involving 'the actual or immediate presence or action of the individual person himself (as opposed to a substitute, deputy, messenger, etc.)' [Citation.]  Such conduct is '[c]arried on or subsisting between individual persons directly.'  [Citations.]  Framed this way, the requisite force must be one-to-one, but does not foreclose participation by others.  [¶] In short, nothing in the terms 'personally' or 'inflicts,' when used in conjunction with 'great bodily injury' in section 1192.7[, subdivision] (c)(8), necessarily implies that the defendant must act alone in causing the victim's injuries.  Nor is this terminology inconsistent with a group melee in which it cannot be determined which assailant, weapon, or blow had the prohibited effect.  By its own terms, the statute calls for the defendant to administer a blow or other force to the victim, for the defendant to do so directly rather than through an intermediary, and for the victim to suffer great bodily injury as a result.  [¶] The challenged instruction reasonably conveys these statutory principles.  CALJIC No. 17.20 requires jurors to first determine the defendant's guilt of the charged crime.  The instruction applies if they then decide that he 'participate[d]' in a group beating, and that 'it is not possible' to determine which assailant inflicted a particular injury.  ( *Ibid.*) Both prongs of the instruction permit a personal-infliction finding in this instance only if the defendant personally 'appli[es] unlawful physical force' to the victim.  ( *Ibid.*)  CALJIC No. 17.20 makes clear that the physical force personally applied by the defendant must have been sufficient to produce great bodily injury either (1) by itself, or (2) in combination with other assailants.  Both group beating theories exclude persons who merely assist someone else in producing injury, and who do not personally and directly inflict it themselves."  ( *Modiri, supra,* 39 Cal.4th at pp. 493-494, 46 Cal.Rptr.3d 762, 139 P.3d 136.)

> In this case a group of three, including [petitioner], attacked Doe.  The evidence shows that [petitioner] leveled the first blow, punching Doe in the face with a closed fist.  The blow jolted his

> head. The second assailant knocked Doe to the ground and Doe
> continued to get punched and kicked. [Petitioner] was directly
> involved in the attack, personally and directly inflicted a blow, and
> in combination with the physical force applied by the other
> assailants Doe suffered great bodily injury.

People v. Harvey, WL 1242098 at *9-10.

In sum, the California Supreme Court has conclusively resolved the issue against petitioner. People v. Modiri, 39 Cal. 4th 481, 494-97 (2006), holds that CALJIC 17.20 satisfies the personal infliction requirement in Cal. Penal Code § 12022.7.[11] This court must defer to the California courts' interpretation of section 12022.7. See Estelle, 502 U.S. at 67-68 (holding federal writ not available for alleged error in the interpretation or application of state law); Aponte v. Gomez, 993 F.2d 705, 707 (9th Cir. 1993) (holding federal courts are "bound by a state court's construction of its own penal statutes"). Further, the evidence at trial showed that petitioner personally attacked the victim. (RT 190-94, 197-98.) Therefore, there is no possibility the jury found petitioner guilty of assault on the victim in the absence of any personal involvement in the attack.[12]

Petitioner is not entitled to federal habeas relief on this claim.

**CONCLUSION**

For the foregoing reasons:

1. The petition for a writ of habeas corpus is **DENIED**.

2. Petitioner's request that the court take judicial notice of the transcript in the state's separate case against Jason Voelker is **DENIED**.

3. The Declaration of Jason Voelker (Amended Pet. Ex. F) is **STRICKEN.**

---

[11] Although Modiri involved a challenge to CALJIC No. 17.20 as that instruction expresses the "personal infliction" provision in Cal. Penal Code § 1192.7(c)(8), Modiri made clear that its analysis applies equally when the statute in question is section 12022.7, as here. See Modiri, 39 Cal. 4th at 495-97.

[12] Similar challenges to the use of CALJIC No. 17.20 have been rejected by numerous district courts. See Garcia v. Cate, 2010 WL 2843427 at *8-10 (E.D. Cal. Jul. 19, 2010); Robledo v. Kirkland, 2010 WL 960137, at *15-16 (C.D .Cal. Feb. 8, 2010); Solis v. Felker, 2009 WL 4282030 at *4-5 (C.D. Cal. Nov. 25, 2009); Large v. Scribner, 2008 WL 4218486 at *5 (E.D. Cal. Sept. 5, 2008); Perez v. Butler, 2005 WL 2437036, at *6-7 (N.D. Cal. Oct. 03, 2005).

1       4.  The clerk shall enter judgment and close the file.

2  ///

3  ///

4                **CERTIFICATE OF APPEALABILITY**

5       Pursuant to Rule 11 of the Rules Governing Section 2254 Cases, a certificate of

6  appealability (COA) under 28 U.S.C. § 2253(c) is **GRANTED** as to petitioner's sufficiency of

7  evidence claim.  The court finds that reasonable jurists viewing the record could find the court's

8  assessment of this claim "debatable or wrong."  <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000).

9  Because petitioner has failed to make a substantial showing that any of his other claims

10  amounted to a denial of his constitutional rights or demonstrate that a reasonable jurist would

11  disagree with this court's assessment, a COA is **DENIED** as to all other claims.  The COA on

12  petitioner's sufficiency of evidence claim does not obviate the requirement that petitioner file a

13  notice of appeal within thirty (30) days of this order.

14

15       IT IS SO ORDERED.

16  DATED: _____

                             RONALD M. WHYTE
                             United States District Judge

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

TRISTAN V HARVEY,

                  Plaintiff,

  v.

M C KRAMER et al,

                  Defendant.

_____/

Case Number: CV08-02947 RMW

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on November 29, 2011, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Tristan V. Harvey V73249
Folsom State Prison
1-C1-22
P.O. Box 950
Folsom, CA 95671

Dated: November 29, 2011

Richard W. Wieking, Clerk
By: Jackie Lynn Garcia, Deputy Clerk